JOHN N. ADRIANI *v.* COMMISSION ON HUMAN RIGHTS
AND OPPORTUNITIES ET AL.
(14167)

PETERS, C. J., CALLAHAN, COVELLO, BORDEN and F. X. HENNESSY, Js.

----

Argued June 5—decision released August 20, 1991

*Leon M. Rosenblatt,* with whom, on the brief, were *Jamie L. Mills* and *Kline H. Mengle, Jr.,* law intern, for the appellant (plaintiff).

*Charles Krich,* staff attorney, with whom, on the brief, was *Philip A. Murphy, Jr.,* commission counsel, for the appellee (named defendant).

*Susan K. Krell,* with whom, on the brief, was *Andrew A. Cohen,* for the appellee (defendant United Illuminating Company).

CALLAHAN, J. The plaintiff, John N. Adriani, appeals from the judgment of the trial court dismissing his appeal from a decision of the named defendant, the commission on human rights and opportunities (commission). The commission had dismissed the plaintiff's employment discrimination complaint without a hearing on the basis of its finding that there was no reasonable cause to believe that a discriminatory practice had been committed by the plaintiff's employer. Because we conclude that the trial court improperly denied the plaintiff the opportunity to present evidence extrinsic to the record, we remand the case for further proceedings.

On January 20, 1988, the plaintiff resigned his position as a buyer for the defendant, the United Illuminating Company (UI), after he had been given the choice of either resigning or being fired. The plaintiff had been employed by UI since September, 1969. On April 14, 1988, the plaintiff filed a complaint with the commission alleging that UI had violated his rights under General Statutes § 46a-60 (a) (1)[1] by discriminating against

---

[1] General Statutes (Rev. to 1987) § 46a-60 (a) (1) provides: "It shall be a discriminatory practice in violation of this section:

"(1) For an employer, by himself or his agent, except in the case of a bona fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against him in compensation or in terms, conditions or privileges of employment because of the individual's race, color, religious creed, age, sex, marital status, national origin, ancestry, present or past history of mental disorder, mental retardation or physical disability, including, but not limited to, blindness."

him on the basis of his physical disability, hypertension. The plaintiff specifically asserted that, after learning that he suffered from hypertension, UI did not make a reasonable effort to accommodate his condition by transferring him to another available position within the company. Pursuant to General Statutes § 46a-83,[2] the investigator for the commission conducted an extensive inquiry concerning the matter and recommended that the plaintiff's complaint be dismissed for lack of reasonable cause. On October 26, 1989, the commission dismissed the complaint. The plaintiff filed a request for reconsideration of the dismissal of his complaint, and the commission subsequently denied the request.

On February 2, 1990, the plaintiff, pursuant to General Statutes § 46a-94a, filed an appeal in the Superior Court from the commission's dismissal of his complaint and its denial of his request for reconsideration.[3] At the first hearing on this matter, the trial court denied the plaintiff's motion to supplement the record by introducing extrinsic evidence in order to prove alleged procedural irregularities in the commission's disposition

---

[2] "[General Statutes (Rev. to 1987)] Sec. 46a-83. COMPLAINT: INVESTIGATION; CONCILIATION; DISCLOSURE; SUBPOENA. (a) After the filing of any discriminatory practice complaint, the chairman of the commission shall refer the same to a commissioner or investigator to investigate and if the commissioner or investigator determines after the investigation that there is reasonable cause for believing that a discriminatory practice has been or is being committed as alleged in the complaint, he shall endeavor to eliminate the practice complained of by conference, conciliation and persuasion.

"(b) No commissioner or investigator may disclose what has occurred in the course of such endeavors provided the commission may publish the facts in the case and any complaint which has been dismissed and the terms of conciliation when a complaint has been adjusted.

"(c) In the investigation of any complaint filed pursuant to this chapter, the commission may issue subpoenas requiring the production of records and other documents relating to the complaint under investigation."

[3] In his appeal to the Superior Court, the plaintiff named as defendants UI, the commission and Vincent Festa, the chairperson of the commission.

of his case. The trial court subsequently dismissed the plaintiff's appeal, concluding that there was substantial evidence in the record to support the investigator's finding, adopted by the commission, that there was no reasonable cause to believe that UI had committed a discriminatory act in violation of § 46a-60 (a) (1).[4] The plaintiff appealed to the Appellate Court, and we transferred the matter to this court pursuant to Practice Book § 4023.

On appeal, the plaintiff claims that the trial court improperly: (1) concluded that there was substantial evidence to support the commission's finding that there was no reasonable cause for believing that UI had discriminated against the plaintiff on the basis of a physical disability; and (2) refused to allow the introduction of evidence outside the record to support the plaintiff's claim of procedural irregularities at the agency level.

I

Before addressing the plaintiff's claim that the trial court should have reversed the commission's finding of no reasonable cause, it is necessary that we review the facts pertinent to this issue. In 1980, the plaintiff was promoted to a position as a buyer in the purchasing department at UI. The plaintiff's performance evaluation for the latter half of 1985 rated him as good overall, but noted some reservations about the plaintiff's attitude toward his job. His 1986 year end evaluation noted significant problems in the plaintiff's performance, which was rated as marginal overall. The report

---

[4] The trial court also rejected the plaintiff's contention that his rights to procedural due process under the federal constitution were violated because the commission dismissed his complaint without allowing a hearing, sworn testimony, confrontation of witnesses or the opportunity to examine documents. Although the plaintiff included this issue in the preliminary statement of issues on appeal, he did not brief it and it is therefore deemed abandoned. *State* v. *Samaha,* 180 Conn. 565, 565 n.1, 430 A.2d 1290 (1980).

did note that the plaintiff's attitude toward his work had improved toward the end of the year, but it also stated that termination was possible if the plaintiff did not continue this improved performance. The 1987 year end evaluation, which was given to the plaintiff by his supervisor, James Nesdale, on December 14, 1987, outlined continuing problems with the plaintiff's performance, and stated that "[i]t is now totally up to [the plaintiff] to effect an immediate and lasting correction of all deficiencies. Failure to do so will result in a recommendation being made for his termination." Nesdale also claimed that, at the time he gave the plaintiff this evaluation, he also gave verbal notice that he would be fired unless his performance improved within the next thirty days. The plaintiff denies that Nesdale ever made such a statement.[5]

The plaintiff took a medical leave of absence from his job from December 14, 1987, to December 29, 1987, because of high blood pressure. That same month, the plaintiff, on the advice of Nesdale, sought professional counseling with UI's employee assistance program, which in turn referred him to John Dolan, chairman of the psychiatry department at St. Vincent's Medical Center. On or about January 7, 1988, William Manniel, manager of training and development for UI, received a letter from Dolan concerning the plaintiff. The letter stated that, largely as a result of a personality clash between the plaintiff and his supervisor, the plaintiff suffered from hypertension and that this condition had become more serious in recent months. Dolan "strongly" recommended that the plaintiff be transferred to another job within UI.

---

[5] There is no entry in the 1987 performance evaluation indicating that the plaintiff was given such a deadline. William Manniel, UI's manager of training and development, told the investigator, however, that the plaintiff had told him that he had received his final disciplinary warning and faced the prospect of termination.

The plaintiff claims that he was told by Manniel shortly thereafter that, because of Dolan's letter, UI considered him a "medical liability" and that this condition could result in his termination. Manniel denied that he made any such statement. He claimed, rather, that he told the plaintiff that efforts were being made to find him another position within the company, but that his past performance significantly hurt his chances for obtaining a transfer. Manniel contended that he told the plaintiff that he would have to be fired if a transfer was not possible because he could not remain in his present position as a buyer. The plaintiff also claims that in early January, 1988, Nesdale "brushed off" his inquiry about an opening in another department and told him that there now was no chance that he would ever be transferred. On January 20, 1988, the plaintiff resigned after being told that he would be terminated if he did not do so. The parties dispute whether, after receiving Dolan's letter, UI made reasonable efforts to accommodate the plaintiff by trying to transfer him to another position in the company. Specifically, the availability of certain positions, as well as the plaintiff's qualifications for such positions, are contested.

General Statutes (Rev. to 1987) § 46a-83 (a) provides that "[a]fter the filing of any discriminatory practice complaint, the chairman of the commission shall refer the same to a commissioner or investigator to investigate and if the commissioner or investigator determines after the investigation that there is reasonable cause for believing that a discriminatory practice has been or is being committed as alleged in the complaint, he shall endeavor to eliminate the practice complained of by conference, conciliation and persuasion."[6] If

---

[6] General Statutes § 46a-83 was amended by Public Acts 1989, No. 89-332. Among other things, that act specifically defined the "reasonable cause" standard. The amended version of the statute, however, does not apply to complaints pending on January 1, 1990, and is therefore not applicable to the present case. See Public Acts 1989, No. 89-332, § 6.

the commissioner or investigator finds that there is "reasonable cause" to believe that a discriminatory act has been committed and the complaint is not settled through the procedures outlined in § 46a-83, the complainant is entitled to a hearing on the matter. General Statutes § 46a-84. The plaintiff claims that UI discriminated against him on the basis of his hypertension by refusing to consider transferring him to another department after receiving the letter from Dolan.[7] UI asserts, to the contrary, that the plaintiff was fired because no positions were available outside his department and it concluded that it could not allow the plaintiff to return to his job as a buyer. UI also contends that the timing of its decision was motivated by its having decided to terminate the plaintiff by the end of January, in any event, due to performance problems.

We first note the limited scope of review to be exercised by the trial court in reviewing a determination that there is no reasonable cause to believe that a discriminatory practice has been committed. "Judicial

[7] The commission contends that hypertension is not a "physical disability" as that term is used in General Statutes § 46a-60 (a) (1). General Statutes (Rev. to 1987) § 46a-51 (15) defines "physically disabled" as referring "to any individual who has any chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic processes or changes as from illness, including, but not limited to, epilepsy, deafness or hearing impairment or reliance on a wheelchair or other remedial appliance or device."

Dolan's letter stated that the plaintiff's hypertension had become a serious problem in recent months. Hypertension is defined as "abnormally high arterial blood pressure." Webster's Third International Dictionary. In addition, the plaintiff had taken a medical leave of absence from work during the last two weeks of 1987 as a result of high blood pressure. On the basis of this record, we conclude that the plaintiff was "physically disabled" within the meaning of § 46a-51 (15).

Our conclusion is also supported by the fact that this claim was not raised during any of the proceedings at the agency level. Therefore, the plaintiff was not provided with an opportunity to provide additional medical documentation for inclusion in the agency record. Under these circumstances, it would be unfair to foreclose the plaintiff's claim on this basis.

review of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable." *Connecticut Light & Power Co.* v. *Department of Public Utility Control,* 216 Conn. 627, 639, 583 A.2d 906 (1990); *Board of Education* v. *Commission on Human Rights & Opportunities,* 176 Conn. 533, 538, 409 A.2d 1013 (1979). The substantial evidence standard is satisfied if the record provides a " 'substantial basis of fact from which the fact in issue can be reasonably inferred. . . .' " *Lawrence* v. *Kozlowski,* 171 Conn. 705, 713, 372 A.2d 110 (1976), cert. denied, 431 U.S. 969, 97 S. Ct. 2930, 53 L. Ed. 2d 1066 (1977).

Before we can apply the substantial evidence test, however, we must resolve the parties' conflicting contentions about the nature of the reasonable cause determination. The plaintiff contends that in making this determination, the investigator, and the commission when reviewing the investigator's recommendation, may consider all of the evidence gathered, but the focus of the inquiry should be on the complainant's representations concerning the alleged discrimination. Moreover, the plaintiff asserts that the commission is not entitled to draw inferences or make credibility determinations that would bear upon disputed material facts. The defendants, however, contend that the commission is allowed not only to consider all the evidence gathered, including that unfavorable to the complainant, but also to make findings concerning material issues of fact by drawing inferences and weighing the credibility of witnesses. We agree with the defendants.

In *Ierardi* v. *Commission on Human Rights & Opportunities,* 15 Conn. App. 569, 546 A.2d 870, cert. denied, 209 Conn. 813, 550 A.2d 1082 (1988), the Appellate Court addressed this specific issue. That court rejected

the claimant's contention that the reasonable cause standard set forth in § 46a-83 is akin to the concept of a "prima facie case," which applies to the complainant's initial burden of production at an adjudicative hearing. Id., 579. The court concluded that "the term 'reasonable cause' as used in the statute is synonymous with 'probable cause.' Cf. *State* v. *Wilson,* 153 Conn. 39, 41, 212 A.2d 75 (1965) ('reasonable grounds to believe,' as used in General Statutes § 6-49 [now § 54-1f (b)] is to be equated with 'probable cause.') Probable cause ' "is a bona fide belief in the existence of facts essential under the law for the action *and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it."* ' (Emphasis added.) *Ledgebrook Condominium Assn., Inc.* v. *Lusk Corporation,* 172 Conn. 577, 584, 376 A.2d 60 (1977), quoting *Wall* v. *Toomey,* 52 Conn. 35, 36 (1884). 'Probable cause is a flexible common sense standard. It does not demand that a belief be correct or more likely true than false.' *Three S Development Co.* v. *Santore,* 193 Conn. 174, 175, 474 A.2d 795 (1984). It deals with probabilities, and the 'application of the factual and practical considerations of everyday life on which reasonable and prudent men act.' *State* v. *Wilson,* supra."[8] *Ierardi* v. *Commission on Human Rights & Opportunities,* supra, 580–81.

We conclude, as did the Appellate Court in *Ierardi,* that the reasonable cause standard requires the commission to consider all reliable probative evidence,

---

[8] We note, however, that this formulation of the reasonable cause standard affects only those claims pending on January 1, 1990. Claims filed after that date are controlled by the statutory definition of reasonable cause provided in the amended version of General Statutes § 46a-83. See footnote 6, supra. We express no opinion on whether the amended statute was intended to articulate the standard articulated in *Ierardi* v. *Commission on Human Rights & Opportunities,* 15 Conn. App. 569, 580–81, 546 A.2d 870, cert. denied, 209 Conn. 813, 550 A.2d 1082 (1988).

including evidence unfavorable to the complainant's claim. In support of this conclusion, the *Ierardi* court noted that one of the purposes of the reasonable cause determination is to protect respondents from having to go through the hearing process in cases where the complaint is baseless. Id., 580, citing *Waterbury* v. *Commission on Human Rights & Opportunities,* 160 Conn. 226, 235, 278 A.2d 771 (1971). In addition to promoting one of the purposes of the reasonable cause finding, this conclusion is also consistent with the principle that we must "make every effort to construe a statutory scheme as a consistent whole." *Powers* v. *Ulichny,* 185 Conn. 145, 149, 440 A.2d 885 (1981); *84 Century Limited Partnership* v. *Board of Tax Review,* 207 Conn. 250, 265, 541 A.2d 478 (1988). The provisions of § 46a-83 (c)[9] allow the commission to issue subpoenas for the production of all relevant evidence and, therefore, contemplate that the commission would consider any reliable information pertinent to a complaint, whether that evidence supports the complaint or casts doubt upon it. *Ierardi* v. *Commission on Human Rights & Opportunities,* supra, 581.

We conclude that a necessary corollary to allowing the commission to consider all relevant evidence gathered during the investigation is that in making the reasonable cause determination, the investigator, and the commission when reviewing the investigator's recommendation, are entitled to make findings on disputed issues of material fact by weighing the credibility of the witnesses and drawing inferences.[10]

---

[9] See footnote 2, supra.

[10] We note that the Appellate Court suggested that it would reach a contrary conclusion. See *Ierardi* v. *Commission on Human Rights & Opportunities,* 15 Conn. App. 569, 581 n.5, 546 A.2d 870, cert. denied, 209 Conn. 813, 550 A.2d 1082 (1988). For the reasons set forth below, we disagree with that conclusion.

The facts of the present case provide a clear illustration of why such a result is necessary "to guard against subjecting a respondent to a hearing upon every complaint which might be made to the commission, however unfounded." *Waterbury* v. *Commission on Human Rights & Opportunities,* supra. In his complaint, the plaintiff asserted that Manniel told him that as a result of Dolan's letter, UI considered him a "medical liability" and that this condition could result in his being terminated. The issue of whether this statement actually was made is a material fact in this case, which, under the plaintiff's formulation of the reasonable cause determination, could not be decided by an investigator. The inevitable result of the plaintiff's position is that any claimant can guarantee that he obtains a hearing simply by alleging in his complaint the existence of direct or overt evidence of discrimination. Such a result would encourage unfounded allegations of overt discrimination, thereby requiring a hearing and effectively rendering the reasonable cause determination a nullity.

Even in the absence of claims of overt discrimination, only in the rare case would there be no issues of material fact concerning a discrimination claim. In the present case, for example, the availability, at the time of the plaintiff's termination, of one of the positions to which he sought to be transferred was a disputed issue of material fact. Under the plaintiff's view, the investigator would not be allowed to make a finding on that issue. In light of the fact that § 46a-83 contemplates that an investigator will examine all the relevant evidence and the likelihood that material issues of fact will remain after an investigation, we conclude that the investigator must be entitled to resolve such issues if the reasonable cause determination is to serve any practical purpose.

We note, however, that the power of the commission, through its investigators, to make findings of material fact as part of the reasonable cause determination, and the trial court's obligation to review such findings under the substantial evidence standard, is conditional upon the commission having conducted a thorough investigation of the claim and having relied only upon reliable, probative evidence in making those findings. In undertaking its investigation, the commission is obligated to pursue evidence corroborating, as well as contradicting, the plaintiff's complaint. Such an inquiry was made in this case, where the investigator examined forty-seven items of documentary evidence and interviewed thirteen people, including the plaintiff, his attorneys, the plaintiff's supervisor and other UI employees, and where the plaintiff failed to name any witness to corroborate his complaint or to demonstrate that the evidence upon which the commission relied was not trustworthy.[11]

Finally, we emphasize that the standards of proof applicable to the reasonable cause determination are not the same as those that apply at the hearing stage. Reasonable cause, and the analogous probable cause standard, require a lesser showing than the preponderance of the evidence standard; *Ierardi* v. *Commission on Human Rights & Opportunities,* supra; and therefore, the nature of the reasonable cause determination is entirely distinct from a ruling on the merits made after a hearing.

[11] We reject the plaintiff's argument that the use of some hearsay statements by the investigator in making his recommendation that the complaint should be dismissed mandates that we exercise de novo review of the finding of no reasonable cause. It is well established that, even at the hearing stage of adjudicative proceedings by agencies, hearsay is admissible if it is reliable and probative. *Jutkowitz* v. *Department of Health Services,* 220 Conn. 86, 108, 596 A.2d 374 (1991). We conclude that the hearsay statements at issue here, which involved statements by UI employees about what they had been told by other UI employees, were sufficiently reliable to be considered by the investigator. Moreover, we note that only a portion of the evidence upon which the investigator relied constituted hearsay.

The basis for the plaintiff's discrimination complaint was his contention that, after receiving Dolan's letter, UI ceased its ongoing efforts to transfer him and thereafter refused even to consider the possibility of a transfer.[12] The plaintiff's complaint and the affidavit filed

---

[12] The plaintiff asserts that the analysis contained in the investigator's report and the staff attorney's memorandum recommending the denial of the motion for reconsideration indicate that the commission misunderstood the nature of his claim. Specifically, he asserts that the portions of those documents that discuss whether his removal from his position as a buyer was based on his past performance are irrelevant because his claim was not that UI discriminated against him by terminating him as a buyer, but rather, that UI failed in its obligation to make a reasonable effort to accommodate his physical condition by transferring him.

We first note that the plaintiff's claim that UI did not "reasonably accommodate" his disability appears to be based on an analogy to the protection afforded by the federal Rehabilitation Act of 1973, 29 U.S.C. § 793 et seq. and 41 C.F.R. § 60-741.6 (d). We do not address whether provisions of General Statutes § 46a-60 (a) (1) forbidding an employer from discriminating on the basis of a physical handicap are coextensive with the provisions of the federal statute, especially the "reasonable accommodation" duty under that statute. Under federal law, "[e]mployers have an affirmative obligation to make a reasonable accommodation for a handicapped employee. Although they are not required to find another job for an employee who is not qualified for the job he or she was doing, they cannot deny an employee alternative employment opportunities reasonably available under the employer's existing policies." *School Board of Nassau County* v. *Arline*, 480 U.S. 273, 289 n.19, 107 S. Ct. 1123, 94 L. Ed. 2d 307, reh. denied, 481 U.S. 1024, 107 S. Ct. 1913, 95 L. Ed. 2d 519 (1987); cf. *Carter* v. *Tisch*, 822 F.2d 465, 467 (4th Cir. 1987) ("an employer is not required to find alternative employment for an employee who cannot perform his job unless the employer normally provides such alternative employment under its existing policies").

In the present case, the plaintiff claims that UI, upon receiving Dolan's letter, stopped its ongoing effort to place him in other departments and thereafter refused to consider transferring him to any available positions because of his hypertension. We conclude that such conduct, if proven, would constitute a discriminatory act forbidden by § 46a-60 (a) (1). We reject, however, the plaintiff's claim that, even assuming that he was slated for termination at the end of January of 1988 and that there were no available jobs for which he was qualified within UI at the time that Dolan's letter was received, this case would still constitute a "mixed motives" case in which the employer's action was motivated by both proper and improper factors. See *Price Waterhouse* v. *Hopkins*, 490 U.S. 228, 247, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989) (plurality opinion). This conclusion is con-

along with his request for reconsideration indicate that he intended to present two different types of proof in support of this claim: (1) direct evidence of discrimination, namely, the statement allegedly made by Manniel that, based on Dolan's letter, the plaintiff was considered a "medical liability";[13] and (2) evidence of the availability of jobs within UI for which the plaintiff was qualified at the time he was terminated.[14]

sistent with the fact that the United States Department of Labor conducted an investigation of this case and concluded that the plaintiff's rights under 29 U.S.C. § 793 had not been violated.

With respect to the plaintiff's assertion that both the investigator's report and the memorandum of the staff attorney for the commission misconstrued the nature of his claim, we note that the complaint did not clearly state the basis of the claim and therefore the commission's conclusion that he was alleging that his removal as a buyer was made on discriminatory grounds was understandable. In any event, the commission's consideration of the evidence of the plaintiff's performance record is still pertinent because this evidence corroborated UI's claim that its repeated attempts to accommodate the plaintiff's request for a transfer were stymied by the fact that managers in other departments were not interested in the plaintiff because of his performance record.

[13] The plaintiff also contends that Nesdale made a statement providing direct evidence of discrimination. Specifically, the plaintiff claimed that in January of 1988 Nesdale had "brushed [him] off" when he inquired about a job opening and told him there now was no chance that he would ever get a transfer to another job within the company. We disagree with the plaintiff's characterization of this statement as "direct evidence" of discrimination. First, the plaintiff's affidavit, although not clear on the timing of this alleged statement, suggests that it was made before the receipt of Dolan's letter. Moreover, even if it was made after the letter was received, the statement could also reasonably be construed to mean that the plaintiff's poor performance record made transfer impossible, and therefore it is not inconsistent with the commission's determination of no reasonable cause.

[14] We note that, had the commission found that the plaintiff was entitled to a hearing, the hearing officer would have had to determine which of two different theories to apply in weighing the proof in this case: (1) the direct evidence, or mixed motives theory; see *Price Waterhouse* v. *Hopkins,* 490 U.S. 228, 246–48, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989) (plurality opinion), and 276–77 (O'Connor, J., concurring); *Miko* v. *Commission on Human Rights & Opportunities,* 220 Conn. 192, 202–203, 596 A.2d 396 (1991); or (2) the disparate treatment theory. See *Texas Department of Community Affairs*

The investigator for the commission found that there was "no cause" for crediting the plaintiff's allegations. In addition, he found that UI intended to terminate the plaintiff as a buyer at the end of January on the basis of his poor performance and was not using his hypertension as a pretext for firing him. The commission

v. *Burdine,* 450 U.S. 248, 252–56, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); *McDonnell Douglas Corporation* v. *Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

In *Price Waterhouse* v. *Hopkins,* supra, 275–76 (O'Connor, J., concurring), the court held that, under the direct evidence theory, once the plaintiff has shown by direct evidence that an impermissible motive was a substantial factor in an employment decision, the defendant must prove by a preponderance of the evidence that the same decision would have been made even if the improper motive did not exist. In order to establish a prima facie case under the disparate treatment theory, the plaintiff must prove that: (1) he is a member of a protected class under the statute; (2) he applied for and was qualified for a position for which the employer was seeking applicants; (3) he was denied the position despite being qualified; and (4) the employer continued to seek applicants for the position after denying the plaintiff's application. See *McDonnell Douglas Corporation* v. *Green,* supra, 802. The burden then shifts to the employer to provide a legitimate nondiscriminatory reason for its action. Id. If the employer does so, the plaintiff then has the opportunity to show that the reason provided by the employer is pretextual. Id., 804.

We note, however, that this choice of theories is irrelevant to the reasonable cause determination. If the commission determines, on the basis of either direct or circumstantial evidence, that there is reasonable cause to believe that a discriminatory motive *has played a role* in an employment decision, the complainant is entitled to a hearing. See *Price Waterhouse* v. *Hopkins,* supra, 249–50 (plurality opinion). Accordingly, it would not be proper for the commission, having made such a determination, to dismiss a complaint on the ground that the employer has sufficient proof to demonstrate that the same action would have been taken in the absence of the discriminatory motive. This adjudicative function must be left to the hearing officer.

The memorandum of the commission's staff attorney recommending the denial of the plaintiff's request for reconsideration does include a section that engages in this type of improper analysis. That portion of the memorandum, however, was mere dictum because the commission, having adopted the investigator's findings, resolved all questions of material fact in favor of UI. Because this improper analysis was not necessary to the commission's determination of no reasonable cause, it does not provide grounds for reversal.

accepted the recommendation of the investigator, thereby adopting his findings, and dismissed the complaint. Finally, the commission accepted the recommendation of its staff attorney to deny the plaintiff's request for reconsideration. The staff attorney's memorandum clearly indicates that the commission also resolved all issues of material fact in UI's favor.[15] The issue, therefore, is whether the investigator's determination that there was no reasonable cause to believe that UI had commited a discriminatory practice, with which the commission agreed, is reasonable in light of the substantial evidence in the record.

The evidence concerning the statement allegedly made by Manniel that UI considered the plaintiff a "medical liability" necessitated a credibility determination between Manniel and the plaintiff, and the investigator and the commission found that Manniel was the more credible party. As we noted above, it is necessary that the commission be allowed to make such credibility determinations if the reasonable cause determination is to serve its intended purpose of screening claims.[16]

Before reviewing the evidence concerning UI's attempts to transfer the plaintiff, we must consider the plaintiff's performance record because it is relevant to UI's

[15] As noted in footnote 12, supra, the staff attorney misconstrued the issue in this case by focusing on whether the plaintiff was qualified to continue to serve as a buyer, rather than whether he was qualified for any available positions within UI at the time Dolan's letter was received. The memorandum makes clear, however, that the commission's decision to dismiss the complaint was made on the basis of its agreement with the findings of the investigator, and therefore it is those findings we shall review.

[16] This same principle governs the commission's finding that the plaintiff had been given a verbal warning by Nesdale in the middle of December, 1988, that he would be terminated if his performance did not improve within the next thirty days. The commission credited the statements of Manniel and Nesdale over that of the plaintiff, who claimed that no such statement was ever made.

claim that his record was an obstacle to a transfer. This evidence is also relevant because it discounts the inference suggested by the plaintiff that the proximity in time between the receipt of Dolan's letter and the plaintiff's termination should necessarily be construed as evidence of discriminatory intent on the part of UI. In addition to the evidence of the plaintiff's poor performance noted above, the record indicates that the plaintiff had considerable difficulty operating UI's automated purchasing system. Despite the fact that he had received extra training on the use of this system, the plaintiff showed little improvement and the plaintiff's supervisor stated that assistant buyers and a new buyer knew more about operating the system than the plaintiff did. In 1986, the plaintiff's workload was temporarily reduced by approximately one third, yet his problems continued. During October and November, 1987, the plaintiff's error rate in the processing of requisitions was more than twice that of the buyer with the next highest error rate and more than three times the average rate of errors for the other buyers, despite the fact that the plaintiff processed the fewest number of requisitions. The performance evaluations also reveal that the plaintiff required more than the normal amount of supervision.[17]

The plaintiff's employment history supports UI's contention that his poor record was a major roadblock to its attempts to find another position for him. From 1985 through the time of the plaintiff's termination, there was an ongoing attempt to accommodate the plaintiff's requests to transfer to another job. In addition to the performance problems noted above, UI officials also cited attitude problems as reasons why the plaintiff was difficult to transfer. The existence of problems with the

---

[17] In his affidavit, the plaintiff contended that his supervisor's criticism of his performance, as reflected in the evaluations, was unjustified and unfair.

plaintiff's attitude toward his work was corroborated by the periodic evaluation reports. Finally, with respect to UI's conduct after it learned that the plaintiff suffered from hypertension, four UI officials, namely, the plaintiff's supervisor, the employment manager, the director of purchasing and the manager of training and development, indicated that one last unsuccessful attempt was made to find a position within UI after Dolan's letter was received.

We do not find it necessary to review in detail the evidence concerning the specific positions that the plaintiff claims were available at the time of his termination. Suffice it to say that the record provides substantial evidence to support the commission's determination that either the plaintiff was not qualified for the positions or that the positions were not in fact available at that time. Finally, we note that the record also includes evidence that between 1985 and 1989, UI accommodated numerous employees with disabilities that included back problems, hand disabilities, anxiety and stress. We conclude that the commission's determination that there was no reasonable cause to believe that UI committed a discriminatory practice was reasonable in light of the substantial evidence in the record.

II

The plaintiff next claims that the trial court improperly denied his motion to supplement the agency record by introducing evidence of alleged procedural irregularities that undermined the commission's determination of no reasonable cause. We conclude that the trial court's denial of this motion was improper.

General Statutes (Rev. to 1987) § 4-183 (f) provides that an administrative appeal "shall be confined to the record" but that "[i]n cases of alleged irregularities in procedure before the agency, not shown in the record, proof thereon may be taken in the court." "An appeal

from an administrative tribunal should ordinarily be determined upon the record of that tribunal, and only when that record fails to present the hearing in a manner sufficient for the determination of the merits of the appeal, or when some extraordinary reason requires it, should the court hear the evidence." *Tarasovic* v. *Zoning Commission,* 147 Conn. 65, 69, 157 A.2d 103 (1959); *Levinson* v. *Board of Chiropractic Examiners,* 211 Conn. 508, 530, 560 A.2d 403 (1989). The determination of whether the trial court improperly denied the plaintiff's motion to supplement the record is made on the basis of the abuse of discretion standard. *Leib* v. *Board of Examiners for Nursing,* 177 Conn. 78, 93, 411 A.2d 42 (1979); *Ierardi* v. *Commission on Human Rights & Opportunities,* supra, 585.

In his complaint, the plaintiff alleged that the commission failed to perform its statutory duty to determine whether reasonable cause existed. The plaintiff also claimed that the commission's procedures favored the dismissal of cases without regard to merit and prevented the staff of the commission from making fair reasonable cause determinations. The complaint stated that these allegations of procedural irregularities would require the presentation of proof not contained in the agency record.

At the first trial court hearing, the plaintiff sought to introduce the testimony of James Noonan, the commission's investigator on this case; Philip Murphy, commission counsel; and Leslie Brett, chairperson of the commission. The plaintiff contended that the testimony of these three witnesses would establish that: (1) neither Noonan nor the commission applied the "reasonable cause" standard in deciding whether to dismiss the plaintiff's complaint; and (2) the commission had a quota system whose goal was to close a certain number of cases each month, and, as a result of this system, Noonan was pressured to reach a "no cause"

finding in this case.[18] The trial court denied the motion to supplement the record on the grounds that: (1) the record was sufficient for the issues that the court had to address; and (2) the plaintiff's motion to supplement the agency record was untimely and failed to give the defendant proper notice.

The plaintiff aptly notes that, assuming his allegations of procedural irregularities are correct, the first rationale proffered by the trial court for its decision would be appropriate only if the court conducted a de novo review of the evidence underlying the commission's determination of no reasonable cause. When, however, the trial court applies the substantial evidence test in reviewing the commission's decision to dismiss the complaint, as it did in this case, it is inappropriate to refuse extrinsic evidence of alleged procedural irregularities on the ground that the existing record is adequate to conduct the review. The substantial evidence test assumes that an agency's decision is not tainted by procedural irregularities that implicate the validity of the decision itself. Where there is a question, as there is in this case, as to whether an agency favored a certain outcome or applied an incorrect standard in reaching its decision, the court must determine whether the alleged procedural irregularities did in fact occur before it can utilize the substantial evidence test.

[18] In his offer of proof, the plaintiff stated that he would prove that Noonan used a "litigation worthy" standard, not the "reasonable cause" standard, that Noonan did not understand the reasonable cause standard and that Noonan was under pressure to reach findings of no cause. The plaintiff also indicated that he intended to question Murphy about testimony Murphy gave before the Governor's Task Force on the Commission on Human Rights and Opportunities concerning the reasonable cause standard and the "litigation worthy" standard, or, alternatively, to introduce a copy of the report of the Governor's Task Force on the Commission on Human Rights and Opportunities. Finally, the plaintiff sought to have Brett testify as to why General Statutes § 46a-83 was amended and why she was named as the new chairperson.

With respect to the second rationale offered by the trial court for its refusal to allow the agency record to be supplemented, we first note that the plaintiff's complaint initiating his appeal clearly stated he sought to supplement the record in order to prove his allegations of procedural irregularities.[19] Moreover, neither the Practice Book nor the General Statutes requires a party to file a written motion to supplement the agency record. Consequently, because of the potentially crucial impact of the plaintiff's claims of procedural irregularities on the propriety of the commission's decision, we conclude that the trial court abused its discretion in denying the plaintiff the opportunity to present evidence to supplement the agency record.[20]

[19] We do not address, however, whether notice of the intention to supplement the record in order to introduce evidence of procedural deficiencies must always be provided at some point prior to the initial hearing, whether in the complaint or another pleading. See *Billings* v. *Commission on Human Rights & Opportunities*, 18 Conn. App. 241, 244, 557 A.2d 147 (1989).

[20] The commission challenged the introduction of this testimony on two other grounds. First, the commission claimed that, contrary to the plaintiff's assertions, Noonan had never been served with a subpoena. This factual issue, however, was never resolved, nor did the trial court rely on this ground in denying the plaintiff's request to supplement the record. We therefore do not address it.

The commission also argued that neither Murphy nor Brett was involved in this case in any manner and that their testimony and the report of the Governor's Task Force on the Commission on Human Rights and Opportunities were irrelevant to the issues in this case. We do not address this argument, however, because the record is not sufficiently clear on this point and it is not material to our disposition of this case. At a minimum, Noonan should have been allowed to testify because he was the investigator who made the preliminary finding of no reasonable cause. At the hearing on this matter, the trial court will have to rule on the relevance of the additional evidence proffered by the plaintiff.

Finally, we reject the commission's assertion that the testimony of Noonan was irrelevant because under § 31-125-11 of the Regulations of Connecticut State Agencies, only the chairperson of the commission, not an investigator, can dismiss a complaint. We find this argument a bit disingenuous. In addition to the fact that the commission adopted Noonan's findings in toto, it would seem likely that if Noonan was under pressure to reach findings of no cause, then that pressure flowed from the hierarchy of the commission.

It is necessary, therefore, that the trial court provide the plaintiff with that opportunity and then determine whether the commission's decision was tainted by procedural irregularities. If the trial court agrees either with the plaintiff's contention that an improper standard was used or with his assertion that Noonan was pressured to reach a finding of no reasonable cause, then the trial court must remand the case to the commission for a new determination of reasonable cause using the proper standard.[21] If, however, the trial court determines that the plaintiff's claims of procedural irregularities are not supported by the evidence presented, then no further proceedings are necessary.

The case is remanded for further proceedings in accordance with this opinion.

In this opinion PETERS, C. J., COVELLO and F. X. HENNESSY, Js., concurred.

BORDEN, J., concurring in part and dissenting in part. I agree with Part II of the majority opinion. I disagree, however, with much of the analysis and with the result reached in Part I of the opinion because it in effect permits the investigative function of the commission to swallow the adjudicative function under the guise of making a determination of no "reasonable cause" pursuant to General Statutes (Rev. to 1987) § 46a-83 (a).

---

[21] The form of our remand is governed by the principle that when a trial court concludes that an administrative agency has made invalid or insufficient findings, the court must remand the case to the agency for further proceedings if the evidence does not support only one conclusion as a matter of law. *Persico* v. *Maher,* 191 Conn. 384, 410, 465 A.2d 308 (1983); *Denby* v. *Commissioner,* 6 Conn. App. 47, 57–58, 502 A.2d 954 (1986). Because the plaintiff's claims implicate the validity of the commission's finding of no reasonable cause, and because the credibility determinations underlying that finding may have been affected by the alleged irregularities, we conclude that the case must be remanded if the trial court finds that the commission's decision was tainted by procedural deficiencies.

I therefore dissent, and would reverse the judgment and remand the case with direction to sustain the plaintiff's appeal.

I agree with the majority that, in making an investigative determination of whether there is reasonable cause, the commission may consider all reliable and probative evidence, including evidence unfavorable to the claim of discrimination. I agree also that the purpose of such a determination is to eliminate the need for hearings on unfounded complaints. The majority views it as a "necessary corollary" to the commission's investigative function, however, "to make findings on disputed issues of material fact by weighing the credibility of the witnesses and drawing inferences." This is where the majority and I part company.

I continue to believe that "the investigator is [not] free *to act as an adjudicative tribunal* by deciding which inferences are appropriately drawn and *by resolving all material factual disputes*. That role is reserved for the hearing officer. [I] believe that the statute does, however, give the investigator the authority to view all the evidence disclosed by the investigation, and to determine whether it produces a bona fide belief in the validity of the claim of discrimination which would satisfy a person of ordinary caution, prudence and judgment." (Emphasis added.) *Ierardi* v. *Commission on Human Rights & Opportunities,* 15 Conn. App. 569, 581 n.6, 546 A.2d 870, cert. denied, 209 Conn. 813, 550 A.2d 1082 (1988). To eschew this view, as the majority does, is to eliminate the line between investigation and adjudication, and effectively to transfer the adjudicative function to the investigator.

I recognize that in arriving at his investigative determination regarding reasonable cause, an investigator may have to draw some inferences and make some credibility determinations. I recognize also that the line

between those two functions is often unclear—that in any given case it may be difficult to determine whether the investigator who has found no reasonable cause has acted as an adjudicative tribunal by resolving the material factual disputes, or has simply determined that the evidence does not produce a bona fide belief in the validity of the claim that would satisfy a person of ordinary caution, prudence and judgment. Drawing such lines is, however, the business of courts in reviewing the doings of an administrative agency such as this commission. The necessity to draw such lines on a case-by-case basis, furthermore, is especially great in this administrative context because we have decided that there is no private cause of action for discrimination under General Statutes (Rev. to 1987) §§ 46a-82 through 46a-96. *Sullivan* v. *Board of Police Commissioners,* 196 Conn. 208, 216–17, 491 A.2d 1096 (1985).

Thus, a dismissal of a claim on the basis of a determination of no reasonable cause, without a hearing, effectively ends the claimant's quest for justice. The majority argues that, unless the investigator is empowered to resolve the material factual disputes, any claimant could guarantee a hearing merely by alleging evidence of direct or overt discrimination. Of course, it is also true that, as a result of the majority's position, any respondent can guarantee a dismissal of a valid claim merely by denying the evidence of overt discrimination and persuading the investigator that he is more credible than the claimant. I do not believe that the legislature meant to give such ultimate power to an investigator. Where, as in this case, there *is* evidence of overt discrimination, the resolution of the material facts underlying that issue is not appropriate for final determination by an investigator. That is what hearings are for.[1]

---

[1] Moreover, the majority's resort to the lesser standard of proof for reasonable cause than for a preponderance of the evidence turns that differ-

The majority's argument posits a rule designed to weed out claims based on false allegations by claimants. In the process, however, it also countenances what may be false denials by respondents on the critical facts underlying the claim. Thus, the majority gives the investigator the power to sweep out what may be valid claims of discrimination in order to protect against the filing of what may be invalid claims. On the facts of this case, I would leave that critical function to adjudication, not investigation.

In this case, there were not one but several critical credibility determinations that the investigator—and the staff attorney for the commission—made adversely to the plaintiff. The combination of these determinations persuades me that the line between investigation and adjudication was impermissibly crossed.

First, the investigator credited Nesdale's oral statement, undocumented in UI's files, that he told the plaintiff that the plaintiff would be fired unless his performance improved within thirty days, and the investigator discredited the plaintiff's denial that Nesdale ever made such a statement. Second, the investigator discredited the plaintiff's statement that Manniel told him that, because of Dolan's letter, UI considered the plaintiff a medical liability, and the investigator credited Manniel's denial of such a statement. Third, the investigator discredited the plaintiff's statement that, shortly after Dolan's letter, Nesdale "brushed off" his inquiry about an opening in another department and told him that there was now no chance that he would ever be transferred.

---

ence on its head. I fail to see how the fact that finding reasonable cause requires *less* of a showing than proof by a preponderance of the evidence can be a justification for permitting an investigator to resolve critical factual disputes, which depend solely on the credibility of witnesses, adversely to the claimant whose credibility is at issue.

The fourth instance of adjudication, rather than investigation, requires some brief factual background, because the majority papers over it by an oblique reference in footnote 14 to "mere dictum." It is hardly that.

After the commission's initial dismissal of the complaint, the plaintiff sought reconsideration on, inter alia, the ground that "the matter was not analyzed as a 'mixed motive' or overt discrimination case as it properly should have been; and, the investigator improperly assumed the role of a hearing officer in reaching his determination." This request for reconsideration was referred to a staff attorney for the commission, who undertook to respond to the request in a detailed five page analysis of the evidence and the law. Of particular importance is the staff attorney's disposition of what she analyzed as the plaintiff's mixed motive claim and his overt discrimination claim.

With respect to the mixed motive claim, the staff attorney specifically referred to the reasons given *by UI* on the plaintiff's termination form: *"The company received a letter from Mr. Adriani's doctor which indicated that for health reasons he should be taken off his current job.* Additionally, supervision had been dealing with Mr. Adriani relative to work performance problems. In view of these circumstances, Mr. Adriani was advised to voluntarily terminate, otherwise, we would have let him go."[2] (Emphasis added.) The staff attorney concluded that "[t]his statement supports complainant's contention that this matter may be analyzed as a mixed motive case. That is, both discriminatory and nondiscriminatory reasons are given for complainant's constructive termination." The staff attorney further stated that in order for UI to avoid liability, "it must *prove by a preponderance of the evi-*

---

[2] The majority does not even refer to this document in its recitation of the facts of this case.

dence" that it would have nonetheless terminated the plaintiff solely on the basis of his purported poor performance. (Emphasis added.) The staff attorney then concluded that "[i]n this case, *the preponderance of the evidence establishes* that respondent would have terminated the complainant solely on the basis of his poor performance." (Emphasis added.) The staff attorney further concluded: "Thus, the investigator's conclusion that a hearing officer could *not* find in favor of complainant appears to be supported by the evidence contained in the file, even when this matter is analyzed as a mixed motive case." (Emphasis in original.)

With respect to the plaintiff's overt discrimination claim, the staff attorney stated that "[i]n such cases, the only defense available to a respondent is *to prove by a preponderance of the evidence* that the same decision would have been made in the absence of the unlawful motive." (Emphasis added.) The staff attorney concluded: "In this case, complainant claims that he was told that he was a 'medical liability'; respondent denies making this statement. Thus, the alleged direct evidence of intent is disputed. Moreover, even if it were undisputed, as discussed above, respondent has sufficient evidence to establish that it would have terminated complainant in the absence of the unlawful motive."

The staff attorney accordingly recommended that the plaintiff's request for reconsideration be denied. The commission adopted that recommendation based on the staff attorney's analysis.

I cannot accept the majority's dismissal of this entire analysis as "mere dicta." It was made in specific response to the plaintiff's claims of mixed motive and overt discrimination, it recognized that the plaintiff had produced evidence—indeed, some from UI's own files—supporting those claims, and it concluded, none-

theless, that UI had successfully rebutted that evidence *by a preponderance of the evidence.* If that is not adjudication, performed without benefit of a hearing, I do not know what is.